**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1475
_____

ADEL SULTAN MOHAMMED GHANEM,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of a Decision
of the Board of Immigration Appeals
(Agency No. A055-775-985)
Immigration Judge: Leo A. Finston
_____

Argued: March 16, 2021
_____


Before:  KRAUSE, PHIPPS, and FUENTES, *Circuit Judges*.

(Opinion Filed:  September 22, 2021)


Ian H. Gershengorn
William R. Weaver [*ARGUED*]
Jenner & Block
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001

Samuel C. Kaplan
1401 New York Avenue, N.W.
Washington, DC 20005

*Counsel for Petitioner*

William P. Barr
Alison M. Igoe [*ARGUED*]
Erik R. Quick
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

_____

**OPINION**

_____

KRAUSE, *Circuit Judge*.

Adel Ghanem, a former lawful permanent resident of the United States, seeks to avoid removal to Yemen, from which he fled to avoid persecution on account of political opinion. He pursues three forms of relief that were denied by the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA): asylum under the Immigration and Nationality Act, 8 U.S.C. § 1158(a), withholding of removal under the Act, 8 U.S.C. § 1231(b)(3), and withholding of removal under the Convention Against Torture, 8 U.S.C. § 1252, 8 C.F.R. § 1208.16(c). Ghanem was kidnapped and tortured before being convicted and sentenced to ten years' imprisonment for political opposition to the Houthi regime. We will therefore grant the petition for review and remand to the BIA.

## I.   Factual and Procedural Background[1]

Whether Ghanem succeeds on appeal depends on whether the IJ's findings, adopted by the BIA, are supported by substantial evidence. We therefore begin by surveying the record before the agency in detail.

### A.   Ghanem's Return to Yemen and Involvement in the Arab Spring

Born in Ba'adan, in Yemen's Ibb Province in 1986, Ghanem was admitted to the United States as a lawful permanent resident in 2003. In 2009, however, Ghanem returned to Yemen to get married, and in 2010, he settled with his wife in the city of Sana'a, where he opened a convenience store.

Within months, a series of pro-democracy uprisings— later known as the Arab Spring—swept across the region. These movements eventually reached Yemen, where activists and members of the general public alike called for the removal of President Ali Abdullah Saleh in favor of a new government that would institute political, social, and economic reforms. Ghanem was among these reformers, joining in a demonstration known as "Dignity Friday" and other peaceful protests calling for "freedom of speech, press, assembly, association and religion and movement." AR1035.

In part, the reforms succeeded: Saleh was eventually forced to step down, and Vice President Abd-Rabbu Mansour Hadi was elected president in a free and fair election. But with that success came civil discord and political reprisals from Saleh supporters. Armed groups continued to foment instability and violence, including a growing Houthi movement composed of members who practiced an "extremist" form of the Shia religion and ultimately allied

---

[1] Because the IJ found Ghanem "generally credible" and credited his testimony as "consistent with the record," JA41, we accept as true his statements of fact and draw the following information from both the administrative record before the agency and the factual accounts offered by the IJ and BIA in their respective decisions.

3

themselves with the ousted president. AR1033–34. The Houthi rebels' internal armed conflict with President Hadi's government forces injected a bitter sectarian struggle into Yemeni politics that has carried into the present, casting both the identity and capacity of Yemen's governing bodies in doubt in the eyes of the international community. As relevant for our purposes, Ghanem had opposed President Saleh at the outset of this struggle and continued to oppose the Houthis and their allies as the political landscape evolved.

It was in this context that, shortly after Hadi's election, Ghanem began noticing suspicious vehicles and people arriving at the building next to his convenience store. At that point, he sought assistance from his uncle-in-law, a well-known figure in the National Security Agency of Yemen who also was opposed to the Houthi rebels, and who instructed Ghanem to monitor the activity next door and to relay what he observed. As Ghanem continued to share information, his uncle-in-law warned him that he "should be careful because [Ghanem] was Sunni" and a potential political target given his open opposition to the Shia militants. AR1040.

## B. Ghanem's Abuse and Kidnapping

Throughout this period, Ghanem's brothers-in-law periodically visited their sister and Ghanem at the couple's home in Sana'a. During one particular visit, before he became aware they had joined the Houthi rebels, Ghanem shared his political beliefs, lamenting how many people had been killed by the Houthis and describing them as "criminals" and "threats to the country." AR1038–39. Ghanem also recounted how he had participated with other protestors on Dignity Friday and how they "were going against the []Shia[]." AR1035, 1039. As Ghanem later recalled, his brothers-in-law then asked a lot of questions, as if attempting to gather information, but they eventually left without incident.

Three days later, however, the brothers-in-law returned. This time, in no uncertain terms, they told Ghanem he "should stop talking and . . . should stop encouraging people against the Shia Houthi." AR1039. In addition to telling him to stop criticizing the Houthis, they also demanded that he join them, but Ghanem refused, telling his brothers-in-law that he "cannot

4

support extremists" and "cannot be with people who carry guns." AR414.

Incensed by his opposition, the Houthi rebels, by now prevalent throughout the city in which Ghanem resided, adopted more flagrant and violent measures to bring him to heel. First, they arrived at his home "with guns drawn," AR1039, and removed his family under the guise of taking them to see his sick mother-in-law. A few days later, Ghanem's "brother[s]-in-law and their cousins along with a few other individuals who were wearing masks pull[ed] up in a car" outside of his house. AR1040. They demanded that he divorce their sister because he was not a Shia Houthi member of the Al-Falahi tribe, and when he refused, "[t]hey started attacking and beating [him]." AR1040. A neighbor witnessed the assault and stepped in to stop it.

It was a temporary reprieve. Three weeks later, the Houthi brothers-in-law and their confederates returned, this time knocking Ghanem unconscious and kidnapping him. Ghanem awoke in a dark room, legs and hands bound by rope. Eventually his captors, whom Ghanem recognized as Houthis, entered the room and threatened that, "they knew who [Ghanem] was so if they asked [him] any question and [he] did not answer honestly they would kill [him]." AR1041. They told Ghanem that "they knew all of [Ghanem's] activities" and that he "should give them what they want" and shouldn't "blame anyone else for [his] faith." AR1041. They wanted "names"—they interrogated Ghanem about "who [he] was . . . working for" and to whom he had given information. AR1041.

Over the next two weeks, his captors returned repeatedly and brutally tortured Ghanem, accusing him of being a spy. They beat him with shoes, spit in his face, hung him upside down, and subjected him to simulated drowning until he was "choking and gasping for breath." AR1041–42. They also forced Ghanem to drink their urine and tied a rubber band around his testicles. For two weeks, Ghanem remained bound without access to a bed or a bathroom, sleeping and relieving himself on the floor, and after each round of abuse, his torturers would ask Ghanem if he had "changed [his] mind" about "giving them information." AR1042. When the kidnappers eventually released him, Ghanem had to be taken

to the intensive care unit of a local hospital where he was treated over the next two weeks for physical and mental suffering.

### C. Ghanem's Efforts to Obtain Justice and Evade Harm

After being released, Ghanem attempted in vain to bring his torturers to justice. Although he brought kidnapping and torture charges against them with the help of an attorney, none of the defendants ever appeared in court. Three of Ghanem's neighbors did, however, appear as witnesses and testified that they observed his beating and kidnapping for his "criticism . . . of [the] Al-Falahi Shia group . . . and his refusal to join them." AR987. The Yemeni court ultimately found Ghanem's captors guilty based on this witness testimony. But as the government was unable bring them in, they were never punished and Ghanem was left without recourse for his emotional, physical, and legal injuries.

Instead, his efforts to obtain justice endangered him further: When his captors learned of the charges, they began to look for him, threatening to "kill [him] and not even [bother with] kidnap[ping]." AR1044. Upon his lawyer's advice, Ghanem fled to his hometown of Ba'adan to hide, but his abusers continued to pursue him. Houthi "members of the Al-Falahi tribe" mobilized by Ghanem's brothers-in-law "came and shot at the house in which he was staying," JA39–40, but Ghanem narrowly escaped.

After a mere two weeks in Ba'adan, Ghanem was forced to flee to Aden, and ultimately to Hadramout, where he hid with his uncle-in-law to avoid the Houthis and their allies as they continued to clash with government security forces and expand throughout Yemen. Ghanem left Yemen for Malaysia altogether in December 2012, and his uncle-in-law was attacked and killed the following year. He then travelled to South Korea, where he continued to express his anti-Houthi opinion and even publicly interacted with Yemeni government officials visiting the region.

6

### D. Houthi Court Proceedings in Yemen

By July 2014, while Ghanem was seeking refuge abroad, the Houthis had gained control of the central government. With the political tables now turned, Ghanem's persecutors obtained a judgment against him *in absentia* from a Houthi-controlled court in West Sana'a, sentencing him to ten years in prison. According to the judgment, Ghanem was convicted of "incit[ing] against order and the regime and for anti-Shia sedition." AR979. The Houthi government also issued an arrest circular "[t]o all the security directors of the governorates and districts," as well as "all ports and military check points" in the provinces and directorates. AR975. The circular, which remains in effect, demands Ghanem's capture immediately upon his return to Yemen.

### E. Ghanem's Return to the United States and Removal Proceedings

In February 2017, Ghanem was detained after he attempted to enter the United States under the mistaken impression that he still possessed a valid immigrant visa as a result of his abandoned lawful permanent resident status. *See* 8 U.S.C. § 1227(a)(1). Appearing *pro se* at the subsequent removal hearing, Ghanem sought asylum and withholding of removal on the basis of past persecution for political opinion under the INA, as well as protection from removal under the CAT. In support of those claims, he submitted a sworn statement describing his persecution and fear of return to Yemen, country conditions reports, letters from family members, and photographs of him with political figures, along with translations of the Yemeni court proceedings against his captors, the 2014 *in absentia* judgment against him, and the 2014 circular issued for his arrest, provided by the Ramada Translation Bureau.

The IJ rejected each of Ghanem's claims. First, the IJ recognized that if Ghanem showed he suffered "past persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion," JA41, he would be "entitled to a rebuttable presumption of a 'well-founded fear of future persecution' on the same basis," *Doe v. Att'y Gen.*, 956 F.3d 135, 150 (3d Cir. 2020) (citing 8

7

C.F.R. § 208.13(b)(1)). To establish eligibility for asylum under either approach, the IJ noted, "the persecution must be or have been committed by the government or by forces that the government is unable or unwilling to control." JA41.

The IJ homed in on the nexus requirement for past persecution and concluded that Ghanem failed to meet his burden. The IJ specifically observed that Ghanem had failed to "specify the political opinion on which [he] relies" and "show that [he] holds that opinion." JA42. Although the IJ found that Ghanem was "generally credible" and had "provided the Court with a sufficient amount of documentary evidence to corroborate his testimony," JA25, he also expressed some concern about the documents submitted with uncertified English translations. As for those, the IJ requested that the Government authenticate the foreign records and that Ghanem try to obtain certifications in order to establish the requisite nexus. But the Government responded that it had not been able to investigate the documents due to the foreign conflict and it disavowed any knowledge of available translation services. And Ghanem, for his part, explained that he "[could not] produce such corroboration" because of the ongoing war in Yemen, his current detention, and his lack of resources to pay for the certifications. *Saravia v. Att'y Gen.*, 905 F.3d 729, 737 (3d Cir. 2018). The IJ ultimately accepted the uncertified translations of Ghanem's court proceedings and arrest order in Yemen into evidence and credited Ghanem's testimony concerning them, but announced he would give them "diminished weight." JA41.

Having discounted, at least in part, the documentary proof Ghanem provided, the IJ concluded that Ghanem "did not provide objective evidence demonstrating his political or religious affiliation and participation," JA41, and therefore had not substantiated the protected ground "purportedly giv[ing] rise to his asylum claim," JA42. The IJ also determined that "the harm suffered by [Ghanem] was on account of familial tensions," and that Ghanem's brothers-in-law simply "used their authority as members of the Houthi rebel group to effectuate his kidnapping and 10-year sentence." JA43. Having found Ghanem ineligible for asylum based on past persecution, the IJ declined to give him the benefit of a rebuttable presumption of future persecution or to find that he

8

could "meet the higher burden of proof for [his] withholding claim." JA27.[2]

As for Ghanem's torture claim, the IJ concluded that Ghanem did not "me[e]t his burden of proof for protection under the CAT." JA44. Despite acknowledging that "the country conditions reports highlight various serious societal problems, including internal conflicts . . . and an inadequate legal infrastructure," and the fact that "the Houthi rebels are effectively the governmental body in a region of Yemen," JA44, the IJ rejected Ghanem's assertion that he is likely to face torture with the government's acquiescence upon his return. The IJ found that the Houthi rebels "do not have control over other regions" and that there was "no objectively reliable evidence demonstrating that [Ghanem's persecutors] have continued searching for him," or would be able to "find him and torture him in regions of Yemen which are not under Houthi control." JA44.

Ghanem appealed to the BIA, which affirmed the IJ's opinion as to both Ghanem's INA and CAT claims. As for the INA claims, like the IJ, the BIA questioned Ghanem's alleged political affiliations and, although it also found his testimony credible, concluded Ghanem did not submit "objective evidence demonstrating his political . . . affiliation and participation." JA34. It determined, for example, that he "did

---

[2] Ghanem also challenges the IJ's and BIA's failure to separately analyze his claim for withholding of removal. Because the denial of Ghanem's withholding claim rested solely on the conclusion that he failed to establish eligibility for asylum, a conclusion unsupported by case law and the record here, that denial cannot stand. Yet Ghanem urges this Court to go farther, arguing that he has marshalled sufficient evidence to establish a "clear probability" of future persecution, *Garcia v. Att'y Gen.*, 665 F.3d 496, 505 (3d. Cir. 2011), and that he is therefore entitled to mandatory withholding of removal under 8 U.S.C. § 1231(b)(3)(A). While we agree that the record demonstrates Ghanem suffered past persecution sufficient to support his asylum claim, we leave it for the BIA to determine—consistent with this opinion—whether he has met this higher burden for withholding of removal.

not provide sufficient context for the . . . purported evidence that he was convicted in absentia in 2014 by a Houthi-controlled court to a 10-year sentence." JA34. From this finding, the BIA inferred that "any religious or political aspects to [Ghanem's] claim play[ed] merely a tangential role in the harm suffered." JA34. The Board then agreed with the IJ that, because Ghanem failed to establish eligibility for asylum, he did not meet his burden of proof for withholding of removal.

The BIA also affirmed the denial of CAT protection, adopting the factual findings and reasoning of the IJ. No further explanation was provided, and the BIA ordered Ghanem removed. Ghanem timely filed this petition for review.

## II.    **Discussion**[3]

On appeal, Ghanem contends the IJ's findings are not supported by substantial evidence and, in relying on them to reach the rulings it made, the BIA also erred as a matter of law.[4] We first address his arguments under the INA before discussing his CAT claim.

---

[3] The BIA had jurisdiction over Ghanem's appeal under 8 C.F.R. §§ 1003.1 and 1240.15, and this Court has jurisdiction pursuant to 8 U.S.C. § 1252. Where, as here, the BIA "affirms and partially reiterates the IJ's discussions and determinations, we look to both decisions." *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017). Employing a highly deferential standard of review, we will uphold factual determinations "if they are supported by reasonable, substantial, and probative evidence in the record considered as a whole." *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018) (internal quotation marks omitted). When examining "pure questions of law and applications of law to undisputed facts," however, our review is plenary. *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020).

[4] Here, the BIA has largely adopted the factual findings and legal conclusions of the IJ. We will therefore refer to their collective determinations as those of the "BIA," unless otherwise specified.

## A.     INA Protection

We begin by reviewing the agency's determination that Ghanem was ineligible for asylum under the INA because he was not persecuted "on account of" political opinion.  We perceive two errors in its analysis:  First, the Board's conclusion ignores overwhelming evidence that Ghanem was persecuted on account of political opinion.  Second, it erroneously treated familial relationships as disqualifying and failed to give the proper weight to the substantial record evidence that a protected ground remains one central reason for Ghanem's persecution.

### 1.     *The BIA mistakenly focused only on actual belief instead of imputed political opinion.*

It is the persecutors' actual motivation, not the petitioner's beliefs, that are determinative, so a petitioner need only "provide 'some evidence of [that motive], direct or circumstantial,'" to establish the protected ground underlying his political persecution claim. *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 108 (3d Cir. 2010) (quoting *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 343 (3d Cir. 2008)).  For that reason, the nexus requirement may be satisfied by either a "political opinion the applicant actually holds" or "one the [persecutor] has imputed to him," and it is sufficient for a petitioner to "show that [his persecutors] ha[d] attributed to him [the] political opinion and that he has a well-founded fear of persecution based on that imputed political opinion." *Lukwago v. Ashcroft*, 329 F.3d 157, 181 (3d Cir. 2003) (quoting *Balasubramanrim v. INS*, 143 F.3d 157, 164 n.10 (3d Cir. 1998)).  Either way, "factual circumstances alone" may be sufficient to establish a motivation on the basis of a protected ground. *Espinosa-Cortez*, 607 F.3d at 109 (quoting *Canales-Vargas v. Gonzales*, 441 F.3d 739, 744 (9th Cir. 2006)).

Here, the IJ and BIA determined that Ghanem failed to "specify the political opinion on which [he] relies," JA42 (alteration in original) (quoting *Fatin v. INS*, 12 F.3d 1233, 1242 (3d Cir. 1993)), or to provide sufficient "objective evidence" that he was persecuted on the basis of "his religious or political activity in which he criticized the Shia Houthi rebels," JA34.

11

Yet the record is replete with evidence, including not only his testimony credited by the IJ, but also objective evidence, that Ghanem's persecutors targeted him on the basis of his anti-Houthi opinion. The agency ignored, for example, evidence that Ghanem's brothers-in-law only began targeting him after he expressed anti-Houthi opinions, and specifically told him they did not want him affiliated with their sister because he was not a Shia Houthi. JA39. The Houthis' espionage accusations and demands that Ghanem "give them information" while he was in captivity also illustrate that his torturers were both aware of and angered by his political opposition and his association with his uncle-in-law, a national security official for the Hadi government. AR442, *see* AR441, 1041. Witnesses in the Yemeni court proceedings Ghanem initiated against his attackers testified that Ghanem was kidnapped because of his "criticism of the Shia group," AR987, and the judgment *in absentia* and arrest circular later issued against Ghanem expressly state that his political associations and "anti-Shia sedition" were the bases for his targeting, AR979. That his persecutors were comprised of not just family relations but also Houthis from other regions and even Houthi-controlled institutions further supports the conclusion that Ghanem's persecutors were motivated by the belief that he held an anti-Houthi opinion. The agency's finding that Ghanem was kidnapped and tortured for refusing to divorce his wife "mischaracterizes his testimony [and the record] in such a way as to . . . deprive him from establishing persecution on account of a protected ground." *Chavarria v. Gonzalez*, 446 F.3d 508, 519 (3d Cir. 2006).

In sum, the record overwhelmingly demonstrates that Ghanem's persecutors "'presumed [an] affiliation' with the [Hadi] government—an entity the [Houthis] oppose—[which] is the functional equivalent of a conclusion that []he holds a political opinion opposite to that of the [rebels]," and that they persecuted him on that basis. *Espinosa-Cortez*, 607 F.3d at 111 (quoting *Cordon-Garcia v. INS*, 204 F.3d 985, 992 (9th Cir. 2000)). In light of this abundant evidence, the agency's determination that "there is no indication that [Ghanem] was targeted on account of his . . . political opinion" is utterly unsupported by the record. JA43. Although we are cognizant of the deferential standard of review typically owed to findings

12

of fact made by the BIA, "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." *Espinosa-Cortez*, 607 F.3d at 107. Moreover, "the BIA may not simply overlook evidence in the record that supports the applicant's case." *Id*.

In this instance, the record evidence not only fails to support the BIA's determination that Ghanem did not demonstrate nexus between the persecution he suffered and a protected ground, but also compels the opposite conclusion. *See id*. at 108-14 (reversing BIA's determination that petitioner did not have a well-founded fear of persecution where the agency "completely disregarded" evidence in petitioner's favor and "a reasonable factfinder would be compelled to conclude" to the contrary); *Guzman Orellana v. Att'y Gen.*, 956 F.3d 171, 178-80 (3d Cir. 2020) (holding there was "no need to require agency reconsideration," even where the BIA failed to address one prong of the test, because record established a cognizable particular social group); *Fei Mei Cheng v. Att'y Gen.*, 623 F.3d 175, 191-97 (3d Cir. 2010) (reversing BIA's determination where "the undisputed record evidence compel[led] the conclusion" that petitioner had suffered past persecution). Accordingly, this is one of those "rare circumstances" in which remand on this issue is not necessary, since "application of the correct legal principles to the record could lead only to the same conclusion." *Guzman Orellana*, 956 F.3d at 179 n.23 (quoting *Yusupov v. Att'y Gen.*, 650 F.3d 968, 993 (3d Cir. 2011)).

> **2.  The BIA erroneously treated Ghanem's familial relation to his persecutors as disqualifying where a protected ground was also "one central reason" for the persecution.**

In determining whether nexus is satisfied, we have recognized that the presence of multiple motivations for persecution, including personal conflicts and familial relationships, is not disqualifying. *See Doe*, 956 F.3d at 142. Rather, we ask if a protected ground "was or will be at least one central reason for the persecut[ion]." *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). If so, "whether one of those central reasons

13

is more or less important than another is irrelevant," and conflicts of a personal nature do not necessarily reduce other motivations to the "incidental, tangential, or superficial." *Id.* at 129-30. As is especially true in sectarian and ethnic conflicts, where political affiliation often overlaps with tribal or personal identity, we look not to the identity of the individuals involved but to the "motive of Petitioner's tormentors." *Doe*, 956 F.3d at 142.[5]

Here, although the BIA correctly recited the "one central reason" test, it applied something altogether different. The agency focused exclusively on the familial context of the dispute, observing that "[Ghanem's] brothers-in-law seemingly did not wish for [him] to be associated with their sister" and possibly "used their authority as members of the Houthi rebel group to effectuate his kidnapping and 10-year sentence." JA27. But it failed to account for ample evidence in the record that the animus toward Ghanem extended far beyond his family's manifestations of displeasure with his perceived political opinions, such as his torture and kidnapping at the hands of unrelated Houthis, the shooting he escaped in Ba'adan, a judgment issued against him *in absentia* by a Houthi-controlled court, and a corresponding arrest circular. There is no way to understand these events other than as persecution on account of Ghanem's perceived political opinions. This is highlighted by the fact that Ghanem's brothers-in-law and other Houthi kidnappers repeatedly questioned him about his activities and political contacts while holding him captive and torturing him, and the fact that the

---

[5] Indeed, the violence in *Doe* was incited by the petitioner's own father, who had just found out that his son was gay. *See id.* at 138-39. After being attacked by his father and neighbors, Doe fled to the United States, and this Court concluded that he met the definition of a "refugee." *Id.* at 138, 156. In doing so, we expressly noted the familial tensions at play and that Doe's attack was "instigated by his father's outrage" and belief that his son "brought shame to [his] family." *Id.* at 139, 142. We may very well have reached a different conclusion in *Doe* if we had applied the BIA's logic here, which suggests that familial involvement severs the connection between a protected ground and the resulting persecution.

14

judgment against Ghanem explicitly states that he was convicted of "incit[ing] against order and the regime and for anti-Shia sedition." AR979. What is more, the BIA failed to recognize that there is no record evidence of any conflict between Ghanem and his Houthi brothers-in-law prior to his expression of political opinion. For example, not only did they attempt to recruit him to their political cause once he shared his beliefs, but, after he refused to join them, they removed his wife and child and attacked him. As even the IJ acknowledged, their justification was that "they did not want their sister to be associated with [Ghanem]; they were . . . Shia Houthis, and [Ghanem] was not." JA23. Applying the "one central reason" test to this evidence, any reasonable adjudicator would be compelled to conclude that "the attack and threats [Ghanem] suffered were motivated" by his apparent beliefs. *Doe*, 956 F.3d at 142; *see* 8 U.S.C. § 1252(b)(4)(B).[6]

---

[6] In concluding that Ghanem failed to establish past persecution on account of political opinion, the agency neglected to provide Ghanem with "notice [and] an opportunity to provide corroborating evidence" or to have his explanation for the unavailability of certain evidence meaningfully considered. *Saravia*, 905 F.3d at 738. First, beyond the request that Ghanem "attempt to get certifications of the translations of the Yemen court records," AR378, the IJ did not explain to Ghanem "what *particular* aspects of [his] testimony it would have been reasonable to expect him to have corroborated." *Abdulai v. Ashcroft*, 239 F.3d 542, 554 (3d Cir. 2001) (emphasis in original). We therefore have no way of knowing which "objective evidence demonstrating his political . . . affiliation and participation"—beyond his testimony and the extensive documentary evidence submitted—the IJ was after. JA41; *see Abdulai*, 239 F.3d at 555. Second, the record does not indicate that the IJ analyzed Ghanem's reasonable explanation that he "cannot produce such corroboration" because of the ongoing war in Yemen, his current detention, and his lack of resources to pay for the certifications— notwithstanding the agency's seeming acceptance of similar explanations from the Government for its own inability to authenticate those documents. *Saravia*, 905 F.3d at 737 (quoting *Chukwu v. Att'y Gen.*, 484 F.3d 185, 192 (3d Cir. 2007)). Instead, the IJ simply "afforded the [evidence] diminished weight." JA38. Having accepted the documentary

## B. CAT Protection

Finally, we review the agency's determination that Ghanem has not met his burden of proof for CAT protection. In determining whether Ghanem has established that he would more likely than not be tortured if removed, the BIA must answer two, multi-part questions. The Board asks: (1) "what is likely to happen to the petitioner if removed" and whether "what is likely to happen amount[s] to the legal definition of torture," and (2) "how public officials will likely act in response to the harm the petitioner fears" and whether that response "qualifies as acquiescence under the governing regulations." *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017). When answering these questions, the BIA must consider "all evidence relevant to the possibility of future torture," including past torture and the possibility of relocating to avoid future harm. 8 C.F.R. § 1208.16(c)(3).

The agency took a much more circuitous route here, penalizing Ghanem for failing to demonstrate the likelihood of events that it thought *should* happen in order to sustain a CAT claim rather than first analyzing "what *is* likely to happen" under the initial *Myrie* inquiry. 855 F.3d at 516 (emphasis added). The IJ and BIA acknowledged that Ghanem "fears that his brothers-in-law . . . will kill him," but conditioned his eligibility for protection on a showing that he "will return to a Houthi-controlled region; that his brothers-in-law have continued searching for him; that they will know that he has returned, that they will find him, [and] that they will torture him.'" JA28; *see also* JA34.

This analysis-by-hypothetical not only threatens to collapse the factual and legal inquiries of *Myrie* and to raise the bar for establishing a likelihood of torture above that required by our case law, *see Myrie*, 855 F.3d at 515-16, but it also produced, in this case, a determination not supported by substantial evidence: that this series of events is unlikely to

---

submissions into the record without questioning their authenticity or veracity, however, the IJ had no basis to disregard their value.

occur. The relevant question here is not simply whether Ghanem's brothers-in-law would know that he returned and take action but whether the Houthis will. And between the testimony the IJ found credible and corroborated, the documents the IJ found supported by that testimony, and the judgment and arrest order reflecting Ghanem's probable detention and torture at any point of entry to the country, the record speaks for itself.

Notwithstanding the agency's findings, the BIA overlooked significant evidence that, in accordance with *Myrie*'s first inquiry, Ghanem is likely to face torture if removed to Yemen. Ghanem's torturers made clear during his two-week captivity that if he did not cease his anti-Houthi activities and leave the country, "there will be no negotiation[,] they will kill [him]." AR1042–43. And the injuries they inflicted—resulting in a two-week stay in the ICU—undoubtedly constituted torture.[7] Following through on their threats, they sent confederates in pursuit of Ghanem when he fled from Sana'a to Ba'adan—the very region the IJ cited as free from Houthi control—and he barely escaped their shooting with his life. His persecutors then obtained a judgment and arrest order against him, demonstrating their control of courts and law enforcement and imperiling his life at "all ports and military check points" if he ever returned to his home country. AR975. Under these circumstances, any reasonable factfinder would be compelled to conclude that Ghanem will likely be tortured if forced to return to Yemen. *See* 8 U.S.C. § 1252(b)(4)(B).

Turning to the second inquiry under *Myrie*, the agency again overlooked significant evidence that Yemeni officials would not only turn a blind eye to Ghanem's torture but, in certain cases, would actively encourage it. State Department reports before the BIA confirm the Houthis' considerable and expanding reach, describing how they routinely engage in "[p]olitically motivated killings" and utilize "politically motivated disappearances and kidnappings" to silence

---

[7] *See Auguste v. Ridge*, 395 F.3d 123, 130 (3d Cir. 2005) (torture is the intentional infliction of "severe pain or suffering, whether physical or mental" for the purpose of obtaining information, punishment, intimidation, or discrimination).

individuals "critical of the Houthi movement." AR590. Indeed, at the time of Ghanem's asylum hearing, the Houthis controlled many of Yemen's major population centers, including Sana'a and Ibb—the governorate in which Ghanem's hometown resides and to which he fled—and, as the conflict has raged on, they have only expanded their reach. Yemen continues to be plagued by "failing state institutions that allowed widespread disregard for the rule of law," along with "killings, disappearances, kidnappings, . . . and torture by security forces and various militant groups," severely limiting the Hadi government's capacity to conduct investigations and prosecute abuse. AR589. And since the Houthis gained "control over most of the security apparatus and state institutions" in 2014, the Hadi government has "remained unable to re-establish fully the rule of law in the territory it holds," AR589, let alone "all [the] ports and military check points" encompassed by Ghanem's arrest order. Contrary to the BIA's finding that Ghanem was not likely to be tortured if returned to a "region[] of Yemen . . . not under Houthi control," JA44, the record compels the conclusion that the Yemeni government, fractured as it is due to the ongoing conflict, was and still is unable or unwilling to fulfill its "duty to intervene" and protect Ghanem from torture. *Myrie*, 855 F.3d at 518; *see* 8 U.S.C. § 1252(b)(4)(B).

Illustrating "gross, flagrant [and] mass violations of human rights" that he would be unable to escape, the record evidence not only fails to support but directly contradicts the BIA's conclusions that Ghanem is not likely to be tortured with the government's acquiescence, if returned to Yemen. 8 C.F.R. § 1208.16(c)(3)(iii).[8] The denial of relief under CAT therefore cannot withstand even our most deferential review.

---

[8] We also note that the IJ erred in its treatment of this country conditions evidence. Although country reports such as these can "constitute sufficient grounds for determining that an applicant would more likely than not be subjected to torture upon return to the country of removal," *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 313 (3d Cir. 2011), the IJ failed to discuss their relevance beyond acknowledging that the reports "highlight various serious societal problems," JA44. While the agency is "not required to write an exegesis on every contention," *Sevoian v. Ashcroft*, 290 F.3d 166, 178 (3d Cir.

18

**III.** **Conclusion**

For the foregoing reasons, we will grant Ghanem's petition, vacate the BIA's order, and remand to the agency for further proceedings consistent with this opinion.

---

2002) (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)), the IJ was required to explain why country conditions evidence favorable to Ghanem was rejected. *See Fei Yan Zhu v. Att'y Gen.*, 744 F.3d 268, 272 (3d Cir. 2014).