**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-2797
_____

BOBBY DEBOE BUNYAN,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of a Decision of the
Board of Immigration Appeals
BIA-1: A208-092-155
Immigration Judge:  Steven A. Morley
_____

Submitted under Third Circuit L.A.R. 34.1(a)
June 28, 2024

Before: JORDAN, SMITH, *Circuit Judges,* and
BUMB, *Chief District Judge**

(Filed: August 22, 2024)
_____

OPINION†
_____

---

* Honorable Renée Marie Bumb, Chief District Judge of the United States District Court
for the District Court of New Jersey, sitting by designation.
† This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

**Bumb**, *Chief District Judge*.

Petitioner Bobby Deboe Bunyan asks us to overturn the Board of Immigration Appeals' (BIA) decision affirming the denial of his asylum application. Arguing he suffered persecution in Liberia because of his anti-corruption political beliefs, Bunyan seeks asylum. There is no dispute that Bunyan suffered past persecution. He was harassed, abducted, and beaten. He received death threats, his family was terrorized, and his sister was killed. The issue centers on whether his persecutors inflicted that harm because of Bunyan's anti-corruption political opinion. The Immigration Judge (IJ) found no evidence that Bunyan suffered those harms because of a political opinion. The BIA agreed. We agree, too, and will therefore deny Bunyan's petition.

I.

A.

Bunyan is a native and citizen of Liberia. In Liberia, Bunyan worked as a bank auditor for the First International Bank (the Bank). Bunyan "monitor[ed] the activity of the [B]ank relating to [the] misappropriation of fund[s], fraud, and detection." AR116. As part of his job responsibilities, in January 2013, Bunyan unearthed a fraudulent scheme involving ten Bank employees—tellers and operational employees—who had stolen about $1.2 million from the Bank. Three of those employees had relatives who worked for the Liberian government: Richard Gboyah (the son-in-law of Robertson Siaway—a representative in the Liberian House of Representatives), Robert Cummings (related to Julius Berrien—a representative in the Liberian House of Representatives), and Jerman Tegli (Bunyan could not name the relative).

2

As part of his "duties at the [B]ank[,]" in mid-February 2013, Bunyan reported the fraudulent scheme to the Bank's "management" and the "Central Bank of Liberia." AR117; AR199. On the same day he filed the report, Bunyan began receiving threatening, anonymous calls with one caller telling Bunyan he was "going to regret the situation." AR119-20. Bunyan estimates he received about six or seven such threatening phone calls.

Somehow, journalists learned of Bunyan's report and approached him to get his "point of view." AR246-47. Journalists questioned Bunyan as to how he was "being protected and how the state is protecting [him]." AR248. Bunyan had no "self-interest" or "reason" to provide the journalists with information or to get his story in the papers. AR249. A Liberian newspaper later published a story about Bunyan, the fraudulent scheme he uncovered, and the threats he received.

In April 2013, Representative Siaway phoned Bunyan about his son-in-law Gboyah's involvement in the fraudulent scheme. Siaway asked Bunyan to visit with him. Bunyan did not meet with Siaway. He traveled to the United States for a training the next month. While in the United States, Bunyan's wife, Mathaline Bunyan, told Bunyan that she, too, had received phone calls from callers threatening to kill her husband when he returned to Liberia. Bunyan returned to Liberia, and two days later, Siaway phoned Bunyan again, but this time with a bribe: Siaway would pay Bunyan $50,000 if Bunyan held a press conference to "deny the case" and refuse to participate in the prosecution. AR122. If he did not agree to accept the bribe, Siaway threatened that Bunyan's "life was going to be in danger." AR123. Bunyan rebuffed Siaway's bribe, telling the representative that he could not accept it because auditing is his profession and "it's [his] integrity."

3

AR126.  In other words, Bunyan would not compromise his integrity "so the auditing . . . [could] be free of corruption." *Id.*

A few days later, four armed men dressed in police uniforms and wearing masks burst into Bunyan's home.  The armed men demanded Bunyan accept the "$50,000 as was being promised."  AR128.  Bunyan again refused the bribe, telling the assailants he "represent[ed] an institution" and "had to defend it until those responsible . . . can be prosecuted."  AR128.  The gunmen then dragged Bunyan to an open field where they beat him with an iron rod for about thirty minutes trying to force him to accept the bribe.  Bunyan eventually passed out, and his two brothers found him unconscious in the field a few hours later.  The brothers found a note next to Bunyan that read: "This is just the beginning of your journey to death if you do not comply."  AR298.  Bunyan's brothers took him to a hospital where Bunyan stayed for two nights because of his injuries.  Bunyan's wife reported the abduction to the police, but no one responded.

Shortly after his abduction, Bunyan and his family fled to a section of Paynesville, Liberia where Bunyan's younger sister lived.  While the Bunyans were asleep, a neighbor observed three individuals setting the Bunyans' house ablaze.  Although Bunyan, his wife, and his children escaped the flames, Bunyan's younger sister did not; she died from burns and smoke inhalation.  A few days after his sister's death, Bunyan received a phone call from the Bank's "head of [] security" who told Bunyan that he saw former rebels at the Bank who had placards with Bunyan's picture and were "looking for [him]."  AR146-47.  The security officer warned Bunyan to be careful.

Following the fire, Bunyan moved to another area of Liberia where, according to Bunyan, nothing happened to him or his family in 2014. But the new year brought new problems. In January 2015, Bunyan discovered a note written on the wall outside of his home stating: "We will kill you and your family." AR369. Bunyan immediately fled to the United States. Bunyan planned to stay in the United States for only a month, but, after learning about more death threats and receiving warnings not to return to Liberia from friends and neighbors there, he applied for asylum and withholding of removal under the Convention Against Torture (CAT).

While Bunyan sought sanctuary in the United States, Bunyan's family in Liberia continued to be tormented. Mathaline continued to receive death threats that she reported to the police. Then, in 2020, armed assailants broke into a building next to the Bunyans' home and stole the family's personal belongings. The assailants told Mathaline that they would come back, and if they discovered Bunyan there, they would kill him or harm his family.

B.

The United States Citizenship and Immigration Services denied Bunyan's asylum application and referred Bunyan to the Department of Homeland Security for removal. Homeland Security served a Notice to Appear on Bunyan claiming he remained in the United States beyond the time allowed. Bunyan admitted he overstayed and conceded removability. The IJ then held a hearing on Bunyan's application for asylum, withholding of removal, and CAT protections.

5

At the hearing, Bunyan testified about the history as set forth above that led to his decision to flee to the United States and seek asylum. He also testified that he went to the police in Liberia twice over the threatening phone calls and his abduction. He added that five individuals involved in the fraudulent scheme at the Bank were acquitted and remain at-large in Liberia. According to Bunyan, "the only reason" he received threats in Liberia is because his persecutors' "family members . . . [were] involved in the fraud" and they "want to have [him] killed" since "their family members are getting in trouble for the fraud they were involved in[.]" AR204-05. And when asked why his persecutors want him killed, Bunyan explained that "they feel [his] presence will have them in prison" and "they're trying to protect themselves from going to prison." AR205.

Bunyan also added that in 2020, four of his friends who worked as auditors in Liberia were killed after discovering government officials stealing large sums of money from the Central Bank of Liberia. Bunyan learned about their deaths from a friend, but those auditors were not connected to the fraudulent scheme that Bunyan uncovered at the Bank. In addition, Bunyan discussed his auditing work at a different bank where he discovered a woman had stolen half-a-million dollars. Like the fraudulent scheme at the Bank, he reported that separate theft as "part of [his] job duty" to the bank, the police, and the Central Bank of Liberia. AR204.

Following the hearing, the IJ denied Bunyan's application for asylum and withholding of removal under the Immigration and Nationality Act (INA), 8 U.S.C. §1231(b)(3). While the IJ found Bunyan credible and that he had suffered past persecution, the judge concluded that Bunyan failed to show he was persecuted because of any

6

anti-corruption political opinion. In doing so, the IJ evaluated Bunyan's asylum claim under the BIA's decision in *Matter of N-M-*, 25 I. & N. Dec. 526 (BIA 2011). *Matter of N-M-* requires immigration judges to consider: (1) "whether and to what extent the alien engaged in activities that could be perceived as expressions of anticorruption beliefs," (2) "any direct or circumstantial evidence that the alleged persecutor was motivated by the alien's perceived or actual anticorruption beliefs," and (3) "evidence regarding the pervasiveness of government corruption, as well as whether there are direct ties between the corrupt elements and higher level officials." *Id.* at 532-33.

Applying *Matter of N-M-*, the IJ found the evidence insufficient to show Bunyan was "harmed on account of his actual or perceived anti-corruption political opinion." AR43. The IJ first noted Bunyan failed to show he held, or his persecutors imputed to him, an anti-corruption political opinion, reasoning that Bunyan reported the fraudulent scheme as part of his job duties at the Bank and "nothing about his job paints his actions as political in nature." *Id.* The judge explained the Bank was private, none of the fraudsters were government officials, and no evidence suggested government officials were involved in the fraudulent scheme. Next, the IJ found Bunyan did nothing "political in nature" other than refuse to cooperate with a lone, corrupt government official. The judge noted Bunyan neither participated in protests nor published literature on government corruption even after Siaway bribed him. Turning to the newspaper article, the IJ found Bunyan did not blow the whistle on government corruption, finding the article silent on the government's involvement in the "threats against his life." *Id.* The IJ added Bunyan never showed that his refusal to cooperate with Siaway was "inherently viewed as political in nature." AR44.

7

Lastly, the IJ found Bunyan's persecutors were not motivated to harm him "on account of his actual or perceived anti-corruption political opinion." AR45. The IJ concluded the evidence "strongly demonstrates" the persecutors were motivated to avoid jail and the consequences of their fraudulent scheme "rather than suppressing [Bunyan's] opinion on corruption." *Id.*

The IJ, however, withheld removal under CAT, finding Bunyan likely would be tortured if removed to Liberia. The judge found the police would likely fail to intervene to protect Bunyan from torture given the police's earlier failures to protect him and lack of arrests. The IJ was particularly troubled by the fact that individuals dressed in police uniforms abducted Bunyan from his home and beat him.

Bunyan appealed. The BIA "adopt[ed] and affirm[ed]" the IJ's decision.[1] AR3. The BIA likewise found no evidence that Bunyan's persecutors targeted him because of an anti-corruption political opinion. The BIA also found Bunyan's failure to prevail on his asylum claim fatal to his request for withholding of removal under INA.

Bunyan timely petitioned for review here.

## II.

8 U.S.C. § 1252(a)(1) gives us jurisdiction to review the final order of removal. Where, as here, the BIA adopts or defers to the IJ's decision, "we review the IJ's opinion as the decision of the agency." *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011), *as amended* (Jan. 13, 2012). Our review of the agency's factual findings is "highly

---

[1] 8 C.F.R. § 1208.2(b) gave the IJ jurisdiction over Bunyan's asylum application. 8 C.F.R. § 1003.1(b)(3) conferred jurisdiction on the BIA to review the IJ's order of removal.

deferential" and those findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Thayalan v. Att'y Gen.*, 997 F.3d 132, 137 (3d Cir. 2021) (quoting *Nasrallah v. Barr*, 590 U.S. 573, 583-84 (2020)). When an asylum seeker challenges the IJ's determination that no nexus exists between the alleged persecution and a statutorily protected ground, we review that determination under the substantial evidence standard. *Id.* at 138; *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481-84 (1992) (analyzing the causal connection between political opinion and persecution as a factual question). That is, "[i]f a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence." *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003) (en banc). We review the agency's legal conclusions de novo. *Da Silva v. Att'y Gen.*, 948 F.3d 629, 633 (3d Cir. 2020).

To qualify for asylum, an alien must show he is a refugee—meaning, he is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see id.* § 1158(b)(1)(B)(i). "Persecution is on account of a protected ground only if that ground 'was or will be at least one central reason for persecuting the applicant.'" *Thayalan*, 997 F.3d at 138 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Hence, an asylum seeker must "show a sufficient 'nexus' between persecution and one of the listed protected grounds." *Ndayshimiye v. Att'y Gen.*, 557 F.3d 124, 129 (3d Cir. 2009).

Opposition to government corruption or whistleblowing falls within the asylum statute's protections for "persecut[ion] on account of political opinion." *Cao v. Att'y Gen.*,

9

407 F.3d 146, 153 (3d Cir. 2005); *accord Changsheng Du v. Barr*, 975 F.3d 444, 447 (5th Cir. 2020); *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000).  An alien can be persecuted for a political opinion he holds or an opinion the persecutor thinks he holds.  *See*, *e.g.*, *Singh v. Gonzales*, 406 F.3d 191, 196 (3d Cir. 2005).  "In determining whether persecution existed on account of political opinion, we focus on whether the persecutor has attributed a political view to the [asylum seeker] and acted on that attribution."  *Id.*  (citation omitted).

The persecutor's "motive [is] critical" and the asylum seeker must show "some evidence of it" either "direct[ly] or circumstantial[ly]."  *Elias-Zacarias*, 502 U.S. at 483; *see also Matter of N-M-*, 25 I. & N. Dec. at 531 ("[A]n alien must demonstrate that the persecutor would not have harmed the applicant if the protected trait did not exist." (citation omitted)).  Persecutors may have multiple motives, but the asylum seeker need only show an anti-corruption political opinion (actual or imputed) was "one central reason" for his persecution—meaning, his opinion was "an essential or principal reason for [it]." *Thayalan*, 997 F.3d at 142 (quoting *Gonzalez-Posadas v. Att'y Gen.,* 781 F.3d 677, 685 (3d Cir. 2015)).  "[W]hether one of those central reasons is more or less important than another is irrelevant."  *Ghanem v. Att'y Gen.*, 14 F.4th 237, 247 (3d Cir. 2021) (quoting *Ndayshimiye*, 557 F.3d at 129-30).  An anti-corruption political opinion that "play[s] only an incidental, tangential, or superficial role in [the] persecution" is insufficient for asylum. *Ndayshimiye*, 557 F.3d at 130.

## III.

Bunyan challenges the agency's nexus determination.  He argues the agency misapplied *Ghanem* by concluding his persecutors were more motivated to protect

10

themselves and their family than to suppress his political opinion. He implores us to review the agency's decision anew, contending the nexus determination is a "question of law." Pet'r Br. in Supp. of Pet. for Review 9, 12, 14. Bunyan contends the agency ignored the "obvious political motivation for the persecution." *Id.* at 12. He also argues the agency misapplied *Matter of N-M-*.[2]

Bunyan's arguments are unavailing for several reasons. Substantial evidence supports the agency's decision that he did not have an anti-corruption political opinion (actual or imputed) and that his persecutors did not target him because of that purported opinion.

First, the record does not support many of Bunyan's claims. Take for example his claim that he went to the press to tell his story about the fraud, the threats he received, and Siaway's conduct. Bunyan's own words foreclose that claim. The press came to Bunyan, not the other way around. In fact, Bunyan admitted that he had no reason or self-interest to give the media information. As another example, Bunyan claims the government and "government-adjacent" individuals perpetuated the fraud. Nothing in the record supports this assertion. The Bank was a private entity. Bunyan never identified a government official who worked at the Bank or had any involvement in the fraud, and he could only name three Bank employees who were related to government officials (for one of those

---

[2] Curiously, Bunyan faults the IJ for not finding he suffered past persecution. But the IJ explicitly found that he did suffer past persecution. Bunyan made the same misstep before the BIA.

11

employees, he could not even explain the relationship to any Liberian government officials).

Second, and contrary to Bunyan's claim, the agency's nexus determination is a factual inquiry we review for substantial evidence. *Thayalan*, 997 F.3d at 138. That determination is binding on us unless the record compels us to reach a different conclusion. 8 U.S.C. § 1252(b)(4)(B). Viewing the record here through the lens of substantial evidence, we are not compelled to do so. The record supports the agency's determination that Bunyan did not hold (nor did his persecutors impute to him) an anti-corruption political opinion. Bunyan reported the fraudulent scheme at the Bank as part of his routine job duties. Merely reporting fraud or corruption as part of one's job responsibilities does not—without more—constitute a political opinion. *See Pavlyk v. Gonzales*, 469 F.3d 1082, 1089 (7th Cir. 2006) (rejecting purported whistle blower's claim of political persecution where petitioner tried to expose government corruption "within his role as a prosecutor"). Indeed, "[t]o receive asylum protection on account of a political opinion, . . . a whistleblower must have sought a political result by going outside of the scope of his official duties and the chain of command." *Haxhiu v. Mukasey*, 519 F.3d 685, 690 (7th Cir. 2008).

Besides performing his job duties as an auditor, Bunyan never engaged in traditional political activities—before or after uncovering the fraudulent scheme at the Bank—such as participating in protests or publicly denouncing corrupt officials, such as Siaway after the attempted bribery. *See generally Haichun Liu v. Holder*, 692 F.3d 848, 852 (7th Cir. 2012) ("Campaigning against the government, writing op-ed pieces, urging voters to oust corrupt officials, founding an anti-corruption political party, actively participating in an

12

anti-corruption party's activities, or speaking out repeatedly as a public gadfly are classic examples of political speech." (citations and internal quotation marks omitted)); *see also Li Wu Lin v. INS*, 238 F.3d 239, 241, 244 (3d Cir. 2001) (finding petitioner eligible for political asylum where he participated in "marches that protested the government's corruption, undemocratic rule, and disregard for human rights"). Even when the press gave Bunyan an opportunity to tell his story, he never used it to espouse anti-corruption political beliefs or blow the whistle on Siaway. Instead, Bunyan told reporters that he suspected Bank employees involved in the fraudulent scheme were the ones who threatened him.

Bunyan's refusal to accept Siaway's bribe—by itself—is also not enough to demonstrate an anti-corruption political opinion even if that refusal led to more threats and attacks against him. *Singh v. Barr*, 935 F.3d 822, 825 (9th Cir. 2019) (explaining an alien's "opposition to isolated corruption or the abuses of rogue officials usually does not . . . evince a political opinion"). Indeed, "'simply demonstrating resistance to pressure to engage in certain acts and consequent retaliation for this resistance is insufficient to establish a nexus' in the anticorruption context." *Skripkov v. Barr,* 966 F.3d 480, 490 (6th Cir. 2020) (quoting *Matter of N-M-*, 25 I. & N. Dec. at 529). As the agency properly found, nothing in the record suggests Siaway viewed Bunyan's refusal as "political in nature." AR44. *See Marku v. Ashcroft*, 380 F.3d 982, 986-87 (6th Cir. 2004) (finding evidence insufficient to show petitioner's refusal to alter employer's books and records "was based on a political opinion" where petitioner never claimed "she ever publicly opposed corruption"). The agency reasonably concluded Bunyan's persecutors did not target him because of an anti-corruption political opinion. Because the record does not show Bunyan

13

held an anti-corruption political opinion or his persecutors attributed one to him, Bunyan's argument that the agency erred by giving more weight to the persecutors' other motivations fails.

Third, even if Bunyan had an actual or imputed anti-corruption political opinion, substantial evidence supports the agency's decision that his opinion was not "one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Indeed, the record does not compel us to conclude Bunyan's purported anti-corruption political opinion was "an essential or principal reason for [his] persecution." *Thayalan*, 997 F.3d at 142 (quoting *Gonzalez-Posadas,* 781 F.3d at 685). The record reveals that Bunyan's persecutors were motivated by their own self-interest in avoiding jail time and the consequences of their fraudulent scheme that Bunyan discovered. *See Singh*, 935 F.3d at 826. Bunyan's own words confirm as much: his persecutors viewed him as a threat to their freedom. *See Grava*, 205 F.3d at 1181 n.3 ("Purely personal retribution is, of course, not persecution on account of political opinion."). And when Siaway tried to bribe Bunyan, the representative discussed how Gboyah was a disgrace to his family, which suggests Bunyan's supposed anti-corruption beliefs were irrelevant to his persecutors. At best, if Bunyan had an anti-corruption political opinion, it "played only an incidental, tangential, or superficial role in [his] persecution." *Ndayshimiye*, 557 F.3d at 130.

Fourth, *Ghanem* offers Bunyan no help. There, we vacated the agency's nexus determination because the agency: (1) ignored evidence showing the persecutors targeted the petitioner after he started expressing his "anti-Houthi opinion[s]"; and (2) focused solely on the "familial context" of the petitioner's dispute with his family and disregarded

14

other evidence showing Ghanem's political views motivated his persecutors. *Ghanem*, 14 F.4th at 245-48. But unlike here, Ghanem participated in demonstrations, openly spoke about his political views, rebuffed his brother-in-law's requests to join a political group he opposed, and so on. *Id.* at 241-42. The record in *Ghanem* compelled us to conclude that his persecutors imputed a political opinion to him and persecuted him because of it. *Id.* at 245-48. But the evidence the agency overlooked and discounted in *Ghanem* is absent here.

Lastly, Bunyan's remaining challenge to the agency's reliance on *Matter of N-M-* is meritless. Despite Bunyan's contrary arguments, *Matter of N-M-* aligns with our decisions on the nexus determination. *Compare Doe v. Att'y Gen.*, 956 F.3d 135, 142 (3d Cir. 2020) ("To satisfy the 'on account of' or nexus requirement, Petitioner's [statutorily protected trait] must have been a motivating factor or at least one central reason for the alleged persecution." (citations and internal quotation marks omitted)), *with Matter of N-M-*, 25 I. & N. Dec. at 532 ("[A]n alien must persuade the trier of fact not just that the alleged persecutor was motivated in some measure by the alien's actual or imputed political belief, but that the protected trait was 'one central reason' for the persecution."). We detect no error in the agency's application of *Matter of N-M-* here.

\* \* \*

Through the INA, Congress limited asylum eligibility to individuals who suffered, or fear suffering, persecution because of, among other reasons, a political opinion. While Bunyan no doubt suffered horrors in his home country, we cannot conclude based on the

15

record that he suffered those horrors because of a political opinion. We will deny his petition.